UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JENNIFER NOELKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) No. 17-cv-800 |
| | ) |
| | ) JURY TRIAL REQUESTED |
| **BOARD OF TRUSTEES OF** | ) |
| **SOUTHERN ILLINOIS UNIVERSITY,** | ) |
| **GOVERNING SOUTHERN ILLINOIS** | ) |
| **UNIVERSITY – EDWARDSVILLE,** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

COMES NOW Jennifer Noelker, by her attorneys, and for her complaint against the Defendant Board of Trustees of Southern Illinois University, Governing Southern Illinois University – Edwardsville, states as follows:

### I. INTRODUCTION

1. This is an action for declaratory and injunctive relief filed pursuant to the Age Discrimination Act ("ADA"), 42 U.S.C. §§ 6101-6107, and its implementing regulation, 34 C.F.R. Part 110, which prohibit discrimination on the basis of age by recipients of federal financial assistance. Because Defendant is a recipient of federal funding from the Department of Education, it is subject to the ADA. Defendant's employees engaged in a practice of discrimination against Ms. Noelker on the basis of her age throughout every stage of her interaction with the School of Nursing – Nurse Anesthetist Program ("Program") at Southern Illinois University – Edwardsville ("SIUE") – from the initial admission process through her eventual termination. As such, Defendant engaged in a practice of discrimination against Ms. Noelker on the basis of her age in violation of the ADA.

1

## II. JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343; and 42 U.S.C. § 6104 and regulations thereunder at 34 C.F.R. Part 110.39. This Court has jurisdiction to issue a declaratory judgment for the foregoing violations pursuant to 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper in in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is a resident of this District and because a substantial part of the events giving rise to these claims occurred within the Southern District of Illinois, as more fully described below.

4. Prior to instituting this lawsuit, Ms. Noelker filed her complaint with the Office for Civil Rights on or about October 6, 2015. She received a final decision on her claim on June 2, 2016, OCR Case. No. 05-16-2005. On July 1, 2016, she served notice by registered mail of her intent to sue based on a violation of the Age Discrimination Act, 42 U.S.C. § 6104 (e), including a notice that she intended to seek attorney's fees, upon all parties required to be served, including Randy Dunn, President of Southern Illinois University - Edwardsville, Misty Whittington, Executive Secretary, Board of Trustees of Southern Illinois University, Loretta E. Lynch, Attorney General of the United States, John B. King, Secretary of the United States Department of Education, and Sylvia M. Burwell, Secretary of the United States Department of Health and Human Services.

## III. PARTIES

5. Ms. Noelker is 49 years old and resides in Washington, Missouri with her husband. She is currently employed as a travelling physical therapist with Therapeutic Resources, Inc.

6. Defendant Board of Trustees of Southern Illinois University, Governing Southern Illinois University – Edwardsville, is a body corporate and politic. Its principal place of business is Carbondale, Illinois.

## IV. STATEMENT OF FACTS

7. From 2012 to 2015, eight students over 40 years of age were accepted and enrolled in the Program. During that same period of time, five students over the age of 40 were terminated from the Program. In other words, **over 50% of the students over the age of 40 were terminated from the Program during that time period**. All five of the terminations occurred during the years 2014 and 2015.

8. Conversely, from 2012 to 2015, 88 students under 40 years of age were accepted and enrolled in the Program. **Only 2 students – representing less than 3% of the under-40 student population enrolled in the Program – were terminated during that same time period**.

9. Ms. Noelker applied for admission to the Program in June 2012 and received a letter of rejection in September 2012. Shortly thereafter, Ms. Noelker spoke with Leslie Jacobs, who was then a preceptor in the Program at Mercy Hospital in Washington, Missouri and had written a letter of recommendation for Ms. Noelker. Ms. Jacobs informed Ms. Noelker that she was not admitted to the Program because she was "too old." Ms. Noelker also spoke with a student from the Program that Ms. Jacobs was working with, and the student stated that she had been involved with the admissions process and confirmed that Ms. Noelker was declined admission to the Program because of her age.

10. On April 30, 2013, Andrew Griffin, then-Director of the SIUE Program, contacted Ms. Noelker. Mr. Griffin informed Ms. Noelker that a position within the Program had become available and offered her admission. Ms. Noelker accepted the invitation and began the Program just two weeks later on May 14, 2013.

11. Ms. Noelker paid SIUE a total of $58,264 in tuition and fees for her enrollment in the Program and continues to owe a total of $49,421 in student loans.

3

12. Prior to her admission to the Program, Ms. Noelker co-founded and was the director of a non-profit, S.T.A.R. Peds, which provided physical and occupational therapy for severely, physically disabled children. In 2008, she returned to school to pursue an accelerated Bachelor of Arts degree in nursing at Maryville University. Ms. Noelker graduated from Maryville in 2010 with a 4.0 grade point average ("GPA"). From 2010 until 2013, Ms. Noelker worked as a nurse in an intensive care unit ("ICU") at St. Anthony's Medical Center. Ms. Noelker left her position at St. Anthony's Medical Center in May 2013 when she enrolled in the Program at SIUE. For the years 2011, 2012, and 2013, Ms. Noelker earned $58,393, $40,531, and $39,190, respectively.

13. Before applying to the Program, Ms. Noelker reviewed all published materials concerning outcomes of SIUE students in the Nurse Anesthesia Program. She discovered that SIUE reported on its web site (1) a 0% attrition rate, (2) a 100% pass rate for the certification exam by the second attempt and (3) an employment rate of 100% for SIUE program graduates. The Program's website stated that SIUE required all applicants to have one year of ICU experience.

14. Immediately after her admission, Ms. Noelker discovered that four younger students who were in her class – Jamie Hart, Aaron Toben, Jenny Carrico and Adam Bertuli – did not have one year of experience in the ICU, despite SIUE's statement that this experience was a requirement for all applicants. At this time, Ms. Noelker began to suspect that the SIUE Program maintained different requirements and standards for its students, namely one set of rules for younger students and another for older students.

15. The initial component of the SIUE Program was a one-year series of content area courses, including among others: pharmacology, anatomy physiology and pathophysiology, and basic and advanced principles of anesthesia. Ms. Noelker's overall GPA following her first year of coursework in the Program was a 3.8. After her first year of coursework, Ms. Noelker was also

4

required to take the National Board of Certification and Recertification for Nurse Anesthetist's ("NBCRNA") self-evaluation examination. A score greater than 350 indicates that a student is on track to pass the Certified Registered Nurse Anesthetist's ("CRNA") board exam. Ms. Noelker obtained an overall scaled score of 375.

16. In January 2014, halfway through Ms. Noelker's first year of coursework, administrators of the Program announced during one of Ms. Noelker's classes that about one-third of the Program's graduating class of December 2013 failed the CRNA board exam. Ms. Noelker is informed and believes that eight students failed this examination. This failure rate was a potentially catastrophic event for the Program, as it exceeded the failure rate standards set by the Council on Accreditation, the body that supports quality assessment and improvement in nurse anesthesia educational programs in the United States. As a result, the Program was put on probation by the Council on Accreditation ("COA") and was subject to possible revocation of accreditation. Loss of accreditation meant that the entire SIUE Nurse Accreditation Program would have to shut down. Ms. Noelker is informed and believes that, if two students from her class failed their CRNA board exams, the Program would lose its accreditation.

17. In February 2014, Paul Darr, Assistant Director of the Program at the time and an SIUE instructor, inquired about Ms. Noelker's age. Ms. Noelker never heard Mr. Darr, Joe Hassler, the SIUE Clinical Coordinator, or any preceptor ask a younger student about their age. Darr explained to Ms. Noelker that he asked about her age because he was writing his dissertation on the science of learning and was aware that older CRNA students often failed examinations because they were unable to perform critical thinking tasks as well as younger students.

18. Ms. Noelker commenced the clinical care portion of the SIUE Program in May 2014. Ms. Noelker was assigned to Mercy Hospital in Washington, Missouri, where she first completed

a two-week observation period and then went on to complete a six-week clinical rotation. On the first day of her observation period, Joe Hassler asked her how old she was. When Ms. Noelker refused to answer the question because she considered it irrelevant and invasive, Mr. Hassler looked up her age on the internet. This interaction set the tone for the rest of Ms. Noelker's time at Mercy Hospital. Thereafter, **all** of Ms. Noelker's clinical coordinators asked her age at the beginning of each of her clinical assignments.

19. Ms. Noelker's Clinical Orientation Evaluation, dated May 26, 2014, was generally very positive. It stated that she was "prompt to clinical and worked hard to prepare for the following day's clinical experience" and that in even areas that were unfamiliar to her that she "was quickly able to catch on and was always willing to learn." The evaluation form noted some areas where she needed to make improvements (i.e., "Pharmacology seemed to be weak, by no fault of the student."), but the comments generally conveyed that she was a hard worker and was very open to learning (i.e., "she has a positive attitude and is always trying to improve herself.").

20. During Ms. Noelker's first clinical rotation, all but one of Ms. Noelker's daily clinical performance evaluations was positive. In addition, all of the daily comments of Ms. Noelker's preceptors in the operating room were positive and highly supportive. Ms. Noelker made only one error during her clinical program: she began extubating a patient too early. Although the level of experience for serving this difficult situation was significantly greater than what should have been expected for a student with Ms. Noelker's level of training, the error was quickly corrected and the patient was not injured. Nonetheless, Clinical Coordinator Joe Hassler (who had previously inquired about Ms. Noelker's age) told administrators of the Program that Ms. Noelker lacked "critical thinking skills" and demonstrated a lack of knowledge about anesthesia medications.

21. On July 7, 2014, Paul Darr, then Assistant Director of the Program, notified Ms. Noelker

of the negative feedback he had been receiving from Mr. Hassler and requested a meeting with Ms. Noelker to discuss an academic improvement plan. Mr. Darr further explained that the feedback would significantly affect Ms. Noelker's grade. Mr. Hassler never discussed his concerns directly with Ms. Noelker, even after she contacted him and asked him about his concerns.

22. Thereafter Ms. Noelker was asked to set up an academic improvement plan to increase her knowledge of how to use medicines, even though her Pharmacology grade was an "A" and her score on the mock self-evaluation exam was 375, above the 350 passing minimum. At exactly the same time, Adam Schneider, a younger SIUE student in the Program who was placed at a different clinical setting, made a medication error and did not suffer either a grade reduction or an academic improvement plan requirement.

23. On July 9, 2014, Ms. Noelker met with Martha Blatchford, CRNA at Mercy-Washington, to review what areas she needed to work on. Ms. Blatchford reviewed the objectives and told Ms. Noelker that there were no areas that she believed Ms. Noelker needed to work on. She went on to tell Ms. Noelker that due to her age she would have to work 300% harder than her younger cohorts because any mistake would be held against her. She further stated that she had personally witnessed this form of discrimination for five years while she was directly affiliated with the Program.

24. Against this backdrop, Ms. Noelker had been caring for her sister who was terminally ill and in the last stages of her illness. Because Ms. Noelker was extremely invested in doing well in the Program, but also wanted to be with her sister, she decided that it would be best to take a temporary leave of absence from the Program. Ms. Noelker then requested and received a leave of absence from the Program in order to return home and care for her terminally ill sister. She left

7

the program on July 11, 2014.

25. Ms. Noelker petitioned for readmission a few months later in late October 2014. She was notified on or about November 20, 2014 that her petition for readmission had been approved. She began taking classes again in the spring of 2015.

26. Ms. Noelker's next clinical rotation was at Carbondale Memorial Hospital in Carbondale, Illinois. She commenced this rotation in May 2015. Once again, her daily clinical performance evaluations were extremely positive and the daily comments by Ms. Noelker's preceptors in the operating room were supportive.

27. Ms. Noelker did, however, make a medication error on June 18, 2015, when she inadvertently pulled up the wrong medication for a patient. Neostigmine was to be administered to return the patient to consciousness, but Ms. Noelker had accidentally pulled up rocuronium. The two medication vials were identical and both were placed side-by-side in Ms. Noelker's drug cart. Ms. Noelker's error delayed the medical procedure for 45 minutes, but the patient suffered no side effects or other injury. Ms. Noelker stayed with the patient until he was ready to be extubated and immediately contacted her clinical coordinator, Anthony Pinto, to tell him about the incident.

28. Mr. Pinto told Ms. Noelker that he had known this kind of medication error was likely and that he had previously notified the hospital that there was an increased risk of a medication error occurring because of the hospital's use of look-alike vials. He had recommended that the hospital use different vials and following the incident, the hospital adopted new procedures. Nonetheless, Ms. Noelker received a "Red Card" for this incident. Ms. Noelker later learned that the patient was the uncle of Andrew Griffin, Director of the Program at the time.

29. A few days later, on June 22, 2015, Ms. Noelker met with Kevin Stein, the newly appointed

8

Assistant Director of the Program, and Michelle Ertel, an instructor in the Program, to discuss the incident. Ms. Noelker explained to Mr. Stein and Ms. Ertel how the medication error had occurred and they all discussed how such an error could be avoided in the future. Ms. Noelker agreed to research how medication errors occur and to create a PowerPoint presentation as a form of remediation. During the meeting, Mr. Stein told Ms. Noelker that her clinical coordinator, Mr. Pinto, said that aside from the medication error that she had been doing a fine job during her rotation and that they were happy to keep her on. Despite this otherwise positive feedback, Mr. Stein told Ms. Noelker that because she had received a Red Card, she would receive an 8-16 point reduction, which would mean her overall grade for the course (N565B) would likely be a B.

30. During the fall of 2014, the Program adopted a system for issuing "special emphasis/comment cards" to document when a student's clinical performance exceeded or fell below the expectations for the clinical level. According to the Student Handbook, Red Cards would be issued whenever "an incident with a student occurs that could or would have caused significant morbidity or mortality without intervention or if a student has created an unacceptable workplace environment." (Program Student Handbook, p. 134). Course syllabi indicated that issuance of a red card would result in a deduction of up to 16% in the overall course grade. However, there were wide variations and discrepancies regarding when and why red cards were issued and the resulting grade deduction. Older students, such as Ms. Noelker, were issued red cards while younger students who committed nearly identical or sometimes even worse errors were not.

31. For example, Adam Schneider, Leah Corbitt, Elizabeth Schappe, and Doug Stiegemeier – all younger students – made similar or worse medication errors compared to Ms. Noelker, but did not receive a Red Card or a reduction in their overall grade, and they were not subjected to any

academic improvement plan.

32. Ms. Noelker began her second clinical rotation at Carbondale Memorial Hospital on July 8, 2015. The first two weeks of her second rotation went smoothly. Ms. Noelker's daily evaluation reports were again all very positive and she conducted all of her procedures without incident. However, on July 24, 2015, Ms. Noelker participated in a difficult procedure, during which Ms. Noelker intubated a patient who had an unanticipated difficult airway. At some point during the procedure, the patient's dental cap popped out. It was unclear how and when the dental cap popped out. Dr. Jeffrey Frakes, the medical doctor of anesthesiology ("MDA") who participated in the procedure, stated at the time that they did not know who had knocked the cap off and that any one of them could have done it. Nevertheless, the CRNA who was present tried to blame it on Ms. Noelker. Dr. Frakes responded that this sort of thing is just part of anesthesia. The patient was not injured, but his dental cap had to be repositioned by a dentist.

33. Following the incident, Ms. Noelker met with Mr. Pinto, the clinical coordinator, who informed her that the Chief Anesthesiologist had asked that she be removed from the facility. Mr. Pinto told Ms. Noelker that he did not agree with the decision, but the Chief Anesthesiologist made the final call.

34. It is not uncommon for tooth caps or teeth to pop out during anesthesia procedures. Nonetheless, and despite the fact that the MDA present during the procedure was unsure who was responsible for damaging the tooth, Ms. Noelker was issued a Red Card for this incident. Younger students in the program – such as Elizabeth Schappe, Desireee Wickenhauser and Adam Schneider – had been involved in procedures that resulted in dental damage during the summer of 2015, but none of them received a grade reduction or a Red Card. Once again, Ms. Noelker was treated differently from the younger students in the Program.

35. On July 27, 2015, Ms. Noelker met with Kevin Stein to discuss the dental cap incident. During the meeting, Ms. Noelker attempted to explain what had happened during the procedure and why it was so difficult. She maintained that all of the teeth were intact when she finished with the patient and she objected to the issuance of a Red Card. Mr. Stein conceded that it sounded like a difficult set of circumstances. He also acknowledged that if Ms. Noelker did not already have another Red Card that the second card might not have been issued. Nonetheless, he told her that she would likely receive a C in the course and she would likely have to finish her cardiac rotation during the break between her spring and summer semester the following year.

36. Following the meeting, Mr. Stein sent Ms. Noelker a Student Assessment Form, which noted that her clinical performance had been "unsatisfactory" and that she remained "below the expected practice level of her cohort." It went on to state she was "currently in danger of failing to meet the course objectives for her progression level prior to the completion of the semester."

37. Over Ms. Noelker's objections, Program faculty told her that she would need to complete the last two weeks of her rotation at Belleville Memorial Hospital. Ms. Noelker was reluctant to do so because she did not believe that two weeks would give her enough time to become oriented to the clinical site and to be fairly evaluated. Ms. Noelker also believed, based on her understanding of the Program's Student Handbook, that because she had been removed from her rotation at Carbondale that she was not allowed to return to a clinical practicum site until Program faculty had met and made a recommendation to the Program coordinator, which would be forwarded to the Program's Graduate Student Affairs Committee for a final decision. Ms. Noelker advised Mr. Stein of the protocol outlined in the Student Handbook. However, Mr. Stein chose to ignore this protocol and insisted that Ms. Noelker finish out her clinical rotation at Belleville Memorial Hospital. This decision was made Tuesday evening, July 28, 2015.

38. Despite her reservations, Ms. Noelker did what she was told and went to Belleville Memorial Hospital the following morning, July 29, 2015. Ms. Noelker was aware that Program administrators had spoken to staff at the site about her situation and felt like she went in to the day at a disadvantage. Initially she was told that she would be working with a Dr. Morton, but was then informed that Dr. Morton was no longer allowing students in his operating room. A little bit later, she was told that Dr. Morton had "calmed down" and that she should report to his operating room. When Ms. Noelker's assigned preceptor arrived, she told Ms. Noelker that she should just observe for the day and that she would receive an orientation the following day, but then later she expected Ms. Noelker to do a number of things and became quite exasperated when Ms. Noelker asked any questions. The preceptor became increasingly impatient with and hostile towards Ms. Noelker, for no apparent reason.

39. Several hours into Ms. Noelker's shift, the clinical coordinator, Dr. Michon Coats, contacted Kevin Stein and told him that things were not going well with Ms. Noelker's placement at Belleville. After consulting with other Program administrators, Mr. Stein decided to pull Ms. Noelker from the site and ordered her to report back to the University immediately for a meeting with Program administrators.

40. Ms. Noelker was extremely distraught, but drove directly to the school to meet with the administrators. She had to leave the meeting a couple of times to regain her composure, but when Mr. Stein questioned her about a medication that had gone missing during her shift that day, she became so upset that she had to leave the meeting.

41. Mr. Griffin, Director of the Program, emailed Ms. Noelker that evening and advised her that she should not report to her clinical site until further notice. Mr. Griffin then referred the matter to the Graduate Student Affairs Committee ("GSAC"). The Committee met on August 5,

2015 and voted to terminate Ms. Noelker from the Program. Ms. Noelker was not present during the committee meeting, even though she was told that she would be contacted by the committee and believed that she would have an opportunity, per the Student Handbook, to present her side of the story to the committee.

42. After receiving GSAC's letter terminating her from the program, Ms. Noelker filed an appeal. On August 28, 2015, Ms. Noelker was allowed to attend a hearing before the SIUE appeals panel, but she was not allowed to cross-exam witnesses or call witnesses to testify on her behalf. On September 3, Ms. Noelker received a letter from the panel affirming GSAC's decision to terminate Ms. Noelker from the Program.

43. Ms. Noelker was not the only older student in the Program who had suffered discrimination on the basis of her age. She was aware of at least two other older students in the Program who had been subjected to harsher penalties and higher standards than younger students in their cohort.

44. On August 10, 2015, prior to being informed of the Committee's decision, Ms. Noelker met with Tom Jordan, SIUE Coordinator for Policy, Communication, and Issues of Concern to discuss her allegations of age discrimination. He suggested that she meet with Chad Martinez, SIUE Director of Equal Opportunity Access and Title IX Coordination. Ms. Noelker met with Mr. Martinez on August 17, 2015 and subsequently filed a timely age discrimination claim with the Office of Civil Rights.

## CLAIM FOR RELIEF – COUNT 1

### Violation of the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101 – 6107

45. The allegations listed above are incorporated herein by reference.

46. Defendant is a recipient of Federal financial assistance.

47. Defendant's actions described above constitute discrimination against Plaintiff on the basis

of her age in violation of the Age Discrimination Act of 1975, 42 U.S.C. §6102.

48. Defendant's actions were intentional and taken with willful disregard for Plaintiff's rights.

49. Plaintiff is an "interested person" within the meaning of 42 U.S.C. §6104(e)(1) and has suffered harm and damages as a result of Defendant's conduct.

50. WHEREFORE, Plaintiff prays that the Court enter an ORDER:

   a. Declaring that Defendant's actions violate the Age Discrimination Act and its implementing regulations;
   b. Granting a permanent injunction ordering Defendant to reinstate Plaintiff in the SIUE Nurse Anesthesia Program;
   c. Awarding Plaintiff her costs, expenses, and reasonable attorney's fees; and
   d. Granting any additional relief as the Court may deem just and proper.

Respectfully submitted,

Law Offices of Thomas E. Kennedy, III, L.C.

*/s/ Thomas E. Kennedy, III*
Thomas E. Kennedy, III (lead counsel)
Sarah Jane Hunt
906 Olive St., Ste. 200
St. Louis, MO 63101
314.872.9041 phone
314.872.9043 fax
tkennedy@tkennedylaw.com
sarahjane@tkennedylaw.com

Attorneys for Plaintiff

14