## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JENNIFER NOELKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 3:17-cv-00800-GCS** |
| | ) |
| **BOARD OF TRUSTEES OF** | ) |
| **SOUTHERN ILLINOIS UNIVERSITY,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Plaintiff Jennifer Noelker first brought suit against Defendant, the Board of Trustees of Southern Illinois University ("SIUE"), on July 26, 2017. (Doc. 1). In her complaint, Plaintiff brings one count, alleging that Defendant discriminated against her based on her age in violation of the Age Discrimination Act of 1975 (the "Act"), 42 U.S.C. § 6102. Plaintiff asserts that Defendant discriminated against her when initially denying her admission to its program, when assigning her high-grade point deductions for clinical errors, and when terminating her from the program on the basis of those errors and her professionalism. *See generally* (Doc. 1). Before the Court is Defendant's Motion for Summary Judgment. (Doc. 154). For the reasons delineated below, Defendant's Motion is **GRANTED.**

### I.   FACTUAL ALLEGATIONS

Plaintiff applied for the Nurse Anesthetist Program (the "Program") at SIUE in May 2012, when she was forty-four years old. (Doc. 160, p. 2). The first time she applied,

Plaintiff received a rejection letter. *Id*. at p. 3. Plaintiff discussed her rejection with Leslie Jacobs, a preceptor for the Program at Mercy Hospital in Washington, Missouri ("Mercy"), who wrote Plaintiff a letter of recommendation. *Id*. Another student who worked in admissions at the SIUE School of Nursing also attended the meeting. *Id*. The student told Ms. Jacobs and Plaintiff that Plaintiff had not been accepted because she was too old. *Id*. Nevertheless, shortly before the academic year was set to begin, Dr. Andy Griffin contacted Plaintiff and offered her a seat in the Program. *Id*. at p. 4.

Between 2012 through 2015, four individuals served as administrators and decisionmakers for the Program, including its clinical components: Dr. Griffin, Dr. Paul Darr, Dr. Kevin Stein, and Dr. Michelle Ertel. *Id*. at p. 2.  Dr. Griffin served as director; his responsibilities included overall administration, including ensuring compliance with accreditation standards. *Id*. Dr. Darr served as assistant director until March of 2015. *Id*. His responsibilities included managing clinical placements and issues pertaining to student clinical performance. *Id*. Dr. Stein replaced Dr. Darr as assistant director in March 2015. *Id*. Prior to March 2015, Dr. Stein served as clinical liaison and was responsible for maintaining relationships with clinical affiliates. *Id*. at p. 3. Dr. Ertel assumed the clinical liaison position in Spring 2015. *Id*.

After Plaintiff enrolled in the Program, she took didactic courses with school faculty, including Dr. Darr. (Doc. 160, p. 4). Dr. Darr began repeatedly asking Plaintiff for her age. *Id*. Dr. Darr told Plaintiff that he was working on a dissertation on the science of learning. *Id*. Based on his research, Dr. Darr believed that older students were not as capable of critical thinking as younger students. *Id*.

The same four administrators who oversaw the Program also coordinated clinical placements and assigned grades for students in clinical courses. (Doc. 160, p. 3). However, anesthesia staff at clinical sites maintained responsibility for providing clinical instruction to students. *Id.* Each site appointed clinical coordinators in conjunction with the Program faculty. *Id.* Clinic staff evaluated students' clinical performance at the end of each day, and at the end of each rotation. *Id.*

Evaluation of students' clinical performance is based on daily evaluations, end-of-rotation evaluations, and "Comment Cards."[1] (Doc. 160, p. 5). Comment Cards come in three colors: "green cards" denote commendation, "yellow cards" are given when a student "needs to show significant improvement," and "red cards" indicate an error resulting in "significant morbidity or mortality." (Doc. 160, Exh. 2, p. 140-141). In 2015, the Program's syllabi began including point deductions for each type of Comment Card. (Doc. 160, p. 5). In Plaintiff's NURS 565B clinical practicum, a "yellow card" could result in a total of eight points being deducted from a student's final grade. *Id.* at p. 6. A "red card" could carry as high as a sixteen-point deduction. *Id.*

Plaintiff practiced clinically at Mercy Hospital in the summer of 2014. (Doc. 160, p. 6). During this rotation, Plaintiff worked under the direction of Clinical Coordinator Joe Hassler. *Id.* Mr. Hassler repeatedly asked Plaintiff about her age. *Id.* at p. 6-7. After searching for her age on the Internet in front of Plaintiff, Mr. Hassler then asked student D.W. to tell him the age of the next student scheduled to practice at Mercy. *Id.* According

---

[1]     "Comment Cards" are also known and referred to as Special Emphasis Cards.

to Mr. Hassler, working with older students made him feel like he was working with his mother. *Id.* at p. 7.

Plaintiff did not receive any negative comments on her daily evaluations during her time at Mercy. (Doc. 160, p. 7). However, in early July, Mr. Hassler contacted Dr. Darr and told him that Plaintiff lacked critical thinking skills. *Id*. Plaintiff was then placed on an academic improvement plan. A registered nurse at Mercy, Martha Blatchford, told Plaintiff that she would have to work 300% harder than younger students because any mistakes Plaintiff made would be held against her. *Id*.

Shortly after her clinical rotation at Mercy, Plaintiff requested and was granted a leave of absence to care for her sister, who was diagnosed with brain cancer. (Doc. 160, p. 7). Plaintiff returned to the Program in January 2015. *Id*. She re-enrolled in her clinical practicum in May 2015 and was placed at Carbondale Memorial Hospital ("Carbondale"), under the supervision of Clinical Coordinator Tony Pinto. *Id*. at p. 7-8. Dr. Stein was the administrator responsible for the practicum at that time. *Id*. at p. 7.

On June 18, 2015, while working with preceptor James Wade, Plaintiff accidentally drew a vial of a paralytic, rather than the appropriate muscle relaxant, while assisting with an outpatient foot surgery. (Doc. 160, p. 7-8). Mr. Wade did not double-check that Plaintiff handed him the correct medication, and he administered the drug to the patient. *Id*. As a result, the patient was placed on a ventilator, but the patient was successfully extubated thirty-five minutes later; however, the patient could have died from the error. (Doc. 155, p. 4); *see also* (Doc. 160, p. 8).

Mr. Pinto recalled that Plaintiff took responsibility for the error. (Doc. 160, p. 8). However, Mr. Pinto issued Plaintiff a "red card" for the incident. *Id*. Dr. Stein informed Plaintiff that the deduction for the "red card" would be decided after examining all feedback from the clinical site, as well as review of a remediation assignment. *Id*.

On July 24, 2015, Plaintiff was involved in a difficult intubation. (Doc. 160, p. 9). Plaintiff and the clinical supervisors she assisted attempted a variety of intubation methods. *Id*. When Plaintiff attempted to intubate, those present heard a "pop." *Id*. After inspection, Plaintiff's supervisors noted that the veneer of the patient's tooth had detached. *Id*. Plaintiff was also issued a "red card" for this incident. Sixteen points were deducted from Plaintiff's final clinical grade for both "red cards," but it is unclear how many points were deducted for each card. *Id*. Dr. Stein noted that he deducted between twelve and fourteen points for the first error when discussing the incident with the Office of Civil Rights. *Id*. However, he also indicated that the first error warranted a full sixteen-point deduction. *Id*. When determining whether to issue both "red cards," Mr. Pinto discussed the errors with Dr. Stein. *Id*. at p. 10. Mr. Pinto stated that he would not have issued the "red cards" on his own. *Id*. After Plaintiff's two errors, the Chief Anesthesiologist at Carbondale requested that SIUE remove Plaintiff from the site. (Doc. 155, p. 4).

Defendant reassigned Plaintiff to a clinical rotation at Belleville Memorial Hospital ("Belleville") to complete her practicum. (Doc. 160, p. 11). While working with registered nurse Lori Warner, Plaintiff was asked to draw two milligrams of Versed from a vial. *Id*. Plaintiff alleges that the vial only contained one milligram of the controlled substance. *Id*.

After this incident, Ms. Warner reported that Plaintiff failed to properly label a drug vial, gave the patient an incorrect amount of a drug, and failed to take responsibility for her lapses in skill and technique. (Doc. 155, p. 5). Later that day, Plaintiff was directed to return to SIUE for a meeting with Dr. Stein and Dr. Griffin, as well as with Dr. Comrie who was another administrator at the Program. (Doc. 160, p. 11). During the meeting, Plaintiff was asked to account for the missing milligram of Versed. *Id*. Plaintiff requested to take a drug test; however, the drug testing site had already closed. *Id*. at p. 11-12. Plaintiff then became angry and abruptly left the meeting. (Doc. 155, p. 5). Though Plaintiff returned shortly thereafter, she then left the meeting a second time in anger and did not return. *Id*.

Dr. Griffin submitted a letter referring Plaintiff's case to the Graduate Student Affairs Committee ("GSAC") on August 1, 2015. (Doc. 155, p. 10-11). In his letter, Dr. Griffin noted three areas of concern: (i) Plaintiff's medication error, (ii) her technical airway skills, and (iii) Plaintiff's inability to accept responsibility, take criticism, and discuss issues with clinic preceptors and Program faculty in an open and honest way. (Doc. 160, p. 12). However, Dr. Griffin noted that the school faculty believed that Plaintiff had the "potential of safely being reintroduced into the clinical area." (Doc. 155, Exh. 6, p. 2). The GSAC terminated Plaintiff from the Program on August 12, 2015. (Doc. 160, p. 12). No member of the GSAC panel discussed or considered Plaintiff's age when making

this decision. (Doc. 155, p. 6). The GSAC affirmed its dismissal decision on August 28, 2015.[2] (Doc. 155, Exh. 17, p. 1).

During Plaintiff's tenure at SIUE, the Program began to experience difficulty maintaining its accreditation. (Doc. 160, p. 14). In November 2014, only sixty-two percent of the Program's 2013 graduating class passed their national certification exam on the first attempt. *Id.* This pass rate fell below the Council on Accreditation of Nurse Anesthesia Education Programs' ("COA") mandatory threshold for first-time exam takers, but it was above the acceptable cut-off for an alternative method for evaluating pass rates. *Id.* Though the COA did not place SIUE on probation, it did send the school a "letter of concern." *Id.*

Other students who attended the Program around the same time as Plaintiff, who were also over the age of forty, claimed similar experiences of discrimination. (Doc. 160, p. 13). For instance, E.V. claims that his participation was terminated after Dr. Darr changed the grade in his clinical course from a "B" to a "C." *Id.* E.V. then had two "Cs," a cut-off permitting the administrators to dismiss him for poor grades. *Id.* E.V. asserts that the administrators told him he would "probably fail out in the future, not find a job, and then have to pay back student loans." *Id.* at p. 14.

Plaintiff's expert witness, Dr. Mariea Snell, statistically supports Plaintiff's claims of discrimination. She found that the Program was much more inclined to offer admission

---

[2]   When Dr. Griffin referred the matter to the GSAC, he was fifty-two years old. (Doc. 155, p. 10-11). At the time that the GSAC made its termination decision, all members of the GSAC were over the age of forty. (Doc. 155, p. 6).

to younger students than older students, despite older students' higher grade point averages. (Doc. 160, p. 4). The probability that this was accidental was only four percent. *Id*. Dr. Snell also found that Defendant likely engaged in discrimination to avoid changing its education standards while maintaining accreditation. (Doc. 160, Exh. 14, p. 1).

Younger students in the Program also made similar errors to Plaintiff's mistakes; however, Plaintiff alleges that they were not treated as harshly as her. (Doc. 160, p. 23-25). For example, twenty-seven-year-old N.K. administered a patient with a paralytic rather than a muscle relaxant; as a result, the patient was placed on a ventilator. *Id*. at p. 23. Though N.K. was noted as having an unprofessional attitude, he only received a ten-point grade deduction for his "red card." *Id*. at p. 24. A.Q. received a "yellow card" and a seven-point deduction for an error resulting in a soft palate injury requiring stiches. *Id*. at p. 25.

## II.    LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205

(7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or determine the truth of the matter[,]" it must ascertain whether a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

## III.   DISCUSSION

Defendant makes two primary arguments in favor of summary judgment: (i) Plaintiff cannot show that her age was the "but-for" cause of her dismissal, and (ii) Plaintiff is not entitled to the type of relief she seeks in her complaint. (Doc. 155, p. 8, 17). Prior to addressing Plaintiff's prima facie case and Defendant's arguments against it, the Court must first determine the proper standard under which to evaluate a claim pursuant to the Act.

## A.   Plaintiff's Burden of Proof under the Age Discrimination Act of 1975

Plaintiff's sole claim for relief is predicated on the allegation that Defendant discriminated against her in violation of the Act, as outlined in 42 U.S.C. § 6102.[3] (Doc. 1, p. 13-14). Under § 6102, " . . . no person in the United States shall, *on the basis of age*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." (emphasis added). Both Plaintiff and Defendant agree that the Act is "rarely litigated." *See* (Doc. 155, p. 1; Doc. 160, p. 17). However, Defendant urges the Court to interpret "on the basis of age"

---

[3]       Plaintiff also asserts that she is an "interested person" within the meaning of the Act, as outlined in 42 U.S.C. § 6104(e)(1). (Doc. 1, p. 14). Defendant does not refute this contention, and it is not at issue in the present motion.

in the context of similar phrasing contained in the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"). (Doc. 155, p. 9, n.6). The ADEA calls for "but-for" causation. In contrast, Plaintiff pursues her claim under a "mixed motive" causation standard, like that employed in some Title VII cases; she seeks to demonstrate that her age was a factor in the Program's decision to dismiss her. (Doc. 160, p. 1). Plaintiff chose to pursue her case under this standard as she concedes that Defendant may have had some legitimate motives for removing her from the program.[4] *Id.* at p. 27.

Many cases involving the Act are dismissed for failure to exhaust administrative remedies. *See Popkins v. Zagel*, 611 F. Supp. 809, 812 (C.D. Ill. 1985); *Homola v. Southern Illinois University at Carbondale, School of Law*, No. 93-1940, 1993 WL 525849, at *1 (7th Cir. Dec. 20, 1993); *Jackson v. Board of Educ.*, No. 10 C 5710, 2012 WL 3079259, at *2 (N.D. Ill. July 27, 2012); *Pramuk v. Perdue Calumet University*, No. 2:12-CV-77, 2012 WL 6552920, at *2 (N.D. Ind. Dec. 14, 2012); *Ford v. Garrett Evangelical-Theological Seminary*, Case No. 13 C 6786, 2013 WL 5587087, at *4 (N.D. Ill. Oct. 10, 2013); *Sheskey v. Madison Metropolitan School Dist.*, No. 12-cv-488-wmc, 2015 WL 881393, at *4 (W.D. Wisc. Mar. 2, 2015); *Covington v. National University*, Case No. 15 C 10452, 2015 WL 7568462, at *2 (N.D. Ill. Nov. 25, 2015).

---

[4]     Plaintiff admits that she made mistakes during her clinical tenure in the Program. *See* (Doc. 160, p. 19-20). However, she also claims that Defendant issued penalties for those mistakes with greater point deductions than those issued to younger students with similar errors. *Id.* Furthermore, though Plaintiff notes that she was accused of possessing a controlled substance while working in her clinical rotation, she alleges that Defendant failed to follow its own procedures for addressing the issue. *Id.* at p. 20. Still, despite these possible legitimate motives, Plaintiff believes the Defendant's ultimate motivation for removing her from the nursing program was her age. *Id.*

Those cases not dismissed for failing to exhaust administrative remedies have often been dismissed on other technical grounds. *See, e.g.*, *Cannon v. Loyola University of Chicago*, 784 F.2d 777, 781 (7th Cir. 1986) (finding that the plaintiff's case was barred by *res judicata*); *Covington v. National University*, No. 17-2508, 726 Fed. Appx. 486, 488 (7th Cir. June 5, 2018) (upholding the lower court's dismissal on the ground of claim preclusion); *Lawrence v. East Cent. Illinois Area Agency on Aging*, No. 10-CV-1240, 2011 WL 1100506, at *4 (C.D. Ill. Feb. 22, 2011) (finding the plaintiff's complaint lacked the facts necessary to show that the defendant participated in a federal program, as required by the Act); *Bolden v. United States*, No. 12-CV-01440, 2013 WL 389028, at *5 (N.D. Ill. Jan. 31, 2013) (dismissing the plaintiff's case because the Act does not apply to federal agencies implementing federal programs); *Sheskey*, 2015 WL 881393, at *4 (holding that the plaintiff's complaint was moot); *Ferguson v. Nissen Staffing Continuum, Inc.*, Case No. 17-cv-198-pp, 2018 WL 1513034, at *4 (E.D. Wisc. Mar. 27, 2018) (dismissing the plaintiff's complaint because it failed to allege that the defendant took an adverse action against the plaintiff). *But see Adams v. Lewis University*, No. 97 C 7636, 1999 WL 162762, at *4 (N.D. Ill. Mar. 12, 1999) (finding that the plaintiff's complaint could survive a motion to dismiss because the plaintiff alleged he was treated differently than similarly situated, younger students, but remaining silent on whether the Act required demonstrating "but-for" causation). As a result, Courts in the Seventh Circuit have not yet determined whether the Act requires Plaintiff to show that her age was *the* "but-for" cause of her dismissal, *see* (Doc. 155, p. 8), or whether the evidence, when examined as a whole, indicates that

Plaintiff's age was one cause, *amongst others*, of Defendant's adverse actions against her. *See* (Doc. 160, p. 17).

The choice as to which causation standard to apply has significant implications for Plaintiff's case. As Judge Posner, succinctly explained in *Greene v. Doruff*, "but-for" causation is another means of requiring that the violation at issue be a necessary cause of the plaintiff's injury. 660 F.3d 975, 978 (7th Cir. 2011). In contrast, in a mixed-motive case, the violation may be a sufficient cause of the plaintiff's injury, though it need not always be a necessary cause of the injury as well. *Id*. Thus, if the Court applies this latter framework, Plaintiff's burden is significantly lowered on summary judgment. *Cf. Welke v. Madison Metropolitan School District*, No. 14-cv-693-wmc, 2016 WL 492327, at *7 n.13 (W.D. Wisc. Feb. 8, 2016) (noting that the *McDonnel-Douglas* test organizes evidence for cases involving both standards, but that "but-for" causation triggers a more stringent standard for a plaintiff than a mixed-motive analysis).

The Seventh Circuit has not explicitly stated whether cases under the Act should proceed under a "but-for" or "mixed motive" causation standard. Prior Supreme Court and Seventh Circuit cases, however, do provide critical guidance. For example, in *Gross*, the Supreme Court determined whether a plaintiff could proceed with a "mixed motive" standard of causation under the ADEA just as in a Title VII case. *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175-178 (2009). Under the ADEA, it is unlawful for an employer to, *inter alia*, refuse to hire or to discharge any individual "because of such an individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). The law further prohibits certain discriminatory actions "on the basis of" or "based on" the plaintiff's age. 29 U.S.C. §

623(b), (e). Similarly, Title VII provides that it is an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added).

The Supreme Court indicated that differences in the statutory history of the two statutes warranted the application of a "but for" causation standard to the ADEA, as opposed to the "mixed motive" standard applied in Title VII cases. *See Gross*, 557 U.S. at 174-175. Of particular importance, the Court noted that after passage of both Title VII and the ADEA, Congress chose to amend Title VII to explicitly provide recovery for plaintiffs with mixed-motive cases. *Id*. In contrast, Congress did not amend the ADEA to provide a similar right of recovery, and the Supreme Court found that this lack of action indicated that Congress did not intend for the ADEA to permit such a right. *Id*. Thus, even though the language in the ADEA and Title VII are similar, courts interpret and apply the laws differently.

The Seventh Circuit noted this key distinction in *Smith v. Wilson*, 705 F.3d 674 (7th Cir. 2013). In *Smith*, an African American plaintiff sued the police chief and police department under Title VI alleging racial bias in the decision to not include his towing business on the town's towing list. *See Smith*, 705 F.3d at 674. The jury found that race was a "motivating factor" in the police chief's decision not to hire the plaintiff. *Id*. at 676. However, the jury *did not* find that the police chief would have hired the plaintiff if race had not been a factor in his decision. *Id*. (emphasis added). Accordingly, the district court found that this mixed verdict precluded relief for the plaintiff. *Id*. On appeal, the Seventh Circuit rejected the plaintiff's contention that he should be entitled to partial relief on the

basis of the jury's "motivating factor" finding. *Id.* at 681. It also rejected plaintiff's contention that once the jury found that race was a sufficient cause of the police chief's decision, that defendants bore the burden of demonstrating that it was not a necessary cause of the decision. *Id.* Though the plaintiff compared Title VI to Title VII, the Seventh Circuit noted that Title VI did not include the same amendments as in Title VII and found it unlikely that Congress would unintentionally neglect to amend Title VI had it wanted to include a right of relief for mixed-motive cases. *Id.* at 680. Instead, the Court noted that it must have explicit statutory support for granting relief in mixed-motive cases. *Id.* (citing *McNutt v. Board of Trustees of the University of Illinois*, 141 F.3d 706, 709 (7th Cir. 1998)). This holding is particularly instructive as the Act is modeled after Title VI. *See Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 934 n.1 (D.C. Cir. 1986). *See also Maloney v. Social Sec. Admin.*, 517 F.3d 70, 75 (2nd Cir. 2008) (noting that the Act's language regarding the programs regulated under the law is "functionally identical" to that in Title VI); 15 Am. Jur. 2d *Civil Rights*, § 366 (2021) (noting that the Act's remedies must be construed in the same manner as those provided for in Title VI).

The Seventh Circuit's post-*Gross* decisions also leave no room for doubt as to which standard to apply. For example, in *Fairley*, the Seventh Circuit dealt with a First Amendment claim under Section 1983. *See Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009). The Seventh Circuit rejected the plaintiff's reliance on cases that indicated the plaintiff need only show that "his speech was a motivating factor in defendant's decision." *Id.* at 525. The Seventh Circuit reasoned that such cases "d[id] not survive *Gross*, which holds that, unless a statute . . . provides otherwise, demonstrating ***but-for causation is part of***

*the plaintiff's burden in all suits under federal law*. *Id.* at 525-526 (emphasis added). *See also Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010) (following *Gross* and noting that "when another anti-discrimination statute lacks comparable language" to that in Title VII, which specifically allows for a mixed-motive claim, such a claim will not be viable under that statute). The Act contains no language explicitly permitting a plaintiff to succeed in a mixed-motive case. The Court is bound by these Seventh Circuit decisions, and as such, it will proceed to analyze Plaintiff's claim under the but-for causation standard.

**B.     Plaintiff's Case Under the *McDonnell-Douglas* Test**

Plaintiff argues that summary judgment should be denied because she has produced sufficient evidence in support of each element of a prima-facie case under the *McDonnell-Douglas* test. (Doc. 160, p. 17- 28). As the Act is modeled after Title VI, Plaintiff must show that the defendant acted with discriminatory intent. *See Gonzalez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1045 (7th Cir. 1987). Proving discriminatory intent can be difficult. The *McDonnell-Douglas* test permits a plaintiff to establish a prima facie case through the use of circumstantial evidence indicating the defendant's intention to discriminate. *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). *See also Comcast Corporation v. National Association of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (describing the *McDonnell-Douglas* test as a "tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination") (internal citations omitted); *Brewer v. Board of Trustees of University of IL*,

479 F.3d 908, 915-924 (7th Cir. 2007) (applying the *McDonnell-Douglas* test to the plaintiff's claims under Title VI and Title VII).

Under the *McDonnell-Douglas* test, a plaintiff alleging discrimination must first show that: (i) she is a member of a protected class; (ii) her performance met the defendant's legitimate expectations; (iii) the defendant took an adverse action against her; and (iv) the defendant treated similarly-situated persons outside of the protected class more favorably. *Cf. Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007) (applying the *McDonnell-Douglas* test to an employment case under Title VII). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate legitimate, non-discriminatory reasons for its actions. *See Barracks v. Eli Lilly and Co.*, 481 F.3d 556, 559 (7th Cir. 2007). The plaintiff may then attack those reasons as a pretext for discrimination due to the plaintiff's age. *See Hossack*, 492 F.3d at 860.

While applicable to Title VI, Title VII, and ADEA discrimination suits, the *McDonnell-Douglas* test requires slight modifications for a case under the Act. For instance, both Title VI and Title VII enumerate readily identifiable classes of protected persons, making it simple for a Court to determine whether a plaintiff satisfies the first prong of the test. *See* 42 U.S.C. § 2000d *et seq.*; 42 U.S.C. § 2000e *et seq.* Equally, the ADEA explicitly limits its protections for those between the ages of forty and seventy-five. *See* 29 U.S.C. § 631(a). In contrast, however, the Act does not specify a particular class of protected persons; it generally prohibits discrimination on the basis of age. *See* 42 U.S.C. § 6102. *Cf. Rannels v. Hargrove*, 731 F. Supp. 1214, 1220 (E.D. Pa. 1990) (holding that the Act equally prohibits both traditional age discrimination and reverse age discrimination).

The Act prohibits a particular decision-making framework, rather than protecting a class of persons. The first prong of the *McDonnell-Douglas* test is therefore inapplicable.

The Court therefore will modify the *McDonnell-Douglas* test to apply to cases under the Act in an educational context. As modified, the test requires a plaintiff to show: (i) that her performance met the defendant's legitimate expectations; (ii) that she was subjected to an adverse action denying or limiting her ability to participate in a federal program despite her adequate performance; and (iii) that the defendant treated similarly-situated participants of a more desirable age group more favorably than the plaintiff. While Plaintiff has seemingly pointed to evidence satisfying the first and third elements, she cannot satisfy the second, and therefore, summary judgment should be granted. The Court will now proceed to analyze each of the elements in turn.

1.      **Whether Plaintiff met Defendant's Legitimate Expectations under the Modified *McDonnell-Douglas* Test**

A plaintiff's prima facie case includes demonstrating that her performance met the program's legitimate expectations for participation. In order to be legitimate, the defendant's expectations must be bona fide; even demanding expectations are permitted so long as the decisionmaker does not apply the standards in a discriminatory manner. *See Bischoff v. Thornton Township*, No. 1:19-CV-04094, 2021 WL 1172263, at *6 (N.D. Ill. Mar. 27, 2021) (considering the ADEA) (internal citations omitted). The proper inquiry requires examining the plaintiff's performance through the eyes of the decisionmakers at the time of the alleged adverse action. *See, e.g.*, *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008) (evaluating a claim under the ADEA) (internal citations omitted). The

essential question is not whether the evaluation of the plaintiff's qualifications for participation in the program is *right*, but whether the decisionmaker's description of its reasons for the evaluation is *honest. See Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (considering a claim under the ADEA) (emphasis in original).[5]

Defendant provides ample evidence that Plaintiff was not meeting its legitimate expectations at the time of her termination from the nursing program. Defendant uses a colored card system in order to communicate the severity of a student's mistakes in a clinical setting. (Doc. 155, p. 3, n.2). A "red card" indicates the mistake is more serious than those warranting a "yellow card." *Id*. However, the number of points deducted for a "red card" differs based on the course and standards outlined by faculty in that course's syllabus. *Id.*

On June 18, 2015, during her clinical placement at Carbondale, Plaintiff received a "red card" for drawing a syringe of a paralytic, instead of an anti-paralytic, during an anesthesia procedure. *Id*. at p. 3. Dr. Stein indicated that between twelve and sixteen points were deducted from Plaintiff's final grade in the clinic for this error. (Doc. 160, p. 9).

---

[5]     *Gustovich*, *Gates*, *Bischoff*, and *Coco* each consider the application of the ADEA. These cases are nevertheless applicable to determining whether a decisionmaker's expectations are legitimate when considering circumstantial evidence of discrimination in this case. Much like a place of employment, Defendant maintains particular standards of performance students must meet in order to continue and complete their education. Cases which evaluate whether an employer's performance review of an employee outlines legitimate expectations for employment and honestly describes whether the employee met those obligations are therefore analogous to this case, in which the Court must determine whether Defendant's expectations for Plaintiff's performance in her clinic were legitimate, and whether Defendant's review of Plaintiff's performance was honest.

On July 24, 2015, Plaintiff received a second "red card" for an error during the intubation of a patient. (Doc. 155, p. 4). The error resulted in damage to the patient's tooth. *Id.* The second "red card" carried a point deduction between zero and four points. (Doc. 160, p. 9). In her deposition, Plaintiff notes that Defendant could have terminated her from the nursing program immediately following receipt of her second "red card." (Doc. 155, Exh. 1, 195:5-14). Instead, the Chief Anesthesiologist at Carbondale requested Plaintiff be removed from the clinical site. (Doc. 155, p. 4).

Plaintiff completed her last two weeks of her clinical rotation at Belleville. (Doc. 155, p. 4). During her only day at the clinical site, Plaintiff's supervisor claims that Plaintiff gave a patient the incorrect amount of a drug, failed to label a drug vial, and failed to take responsibility for lapses in her skill and technique. *Id.* at p. 5. While administering Versed from a two-milligram bottle, Plaintiff noted that the vial only contained one milligram of the drug. (Doc. 160, p. 11). Plaintiff was directed to return to campus to account for the missing milligram of the controlled substance. *Id.* However, during the meeting, Defendant claims that Plaintiff abruptly left in anger. (Doc. 155, p. 5). Based on the above, there is ample evidence in the record to indicate that Plaintiff did not meet Defendant's expectations for students in the nursing program.

Plaintiff, however, argues that Defendant applied its expectations in a disparate manner, thus indicating discriminatory intent. (Doc. 160, p. 22). A defendant's failure to follow its internal procedures for the termination of a plaintiff from a federal program can be indicative of a discriminatory motivation. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 723 (7th Cir. 2005). When a plaintiff provides evidence sufficient to

support an inference that decisionmakers applied legitimate expectations in a disparate manner, the first and third prongs of a plaintiff's prima facie case merge, and the plaintiff may establish her prima facie case by demonstrating that similarly-situated, younger students were treated more favorably. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). This inference requires evidence of "a specific policy that is regularly enforced in similar situations." *Bagwe v. Sedgwick Claims Management Services, Inc.*, 811 F.3d 866, 882 (7th Cir. 2016) (internal citations omitted). However, when a policy explicitly permits a decisionmaker a degree of discretion, the exercise of that discretion does not evidence discrimination. *See Long v. Teachers' Retirement System of Illinois*, 585 F.3d 344, 353 (7th Cir. 2009) (internal citations omitted).

*Long* provides a particularly helpful example for determining whether a decisionmaker exercised discretion as permitted by the policy in question, or whether that decisionmaker applied the policy differently to different groups. The policy at issue in *Long* detailed progressive discipline; the disciplinary steps usually required an oral warning and informal counseling, a written warning and counseling, suspension, and then discharge. 585 F.3d at 353. The policy also stated that management may choose to begin the disciplinary process at any step, depending on the facts and circumstances of each situation. *Id*. When skipping steps prior to discharge, the policy required the supervisor and division head to make recommendations for discharge to the director of human resources. *Id*. In *Long*, the defendants first provided the plaintiff with an oral warning for frequent absenteeism, thus complying with the first step of the disciplinary process. *Id*. However, after these warnings went unheeded, the defendants recommended

to the director of human resources that the plaintiff be discharged. *Id*. Because the defendants had the discretion to skip steps in the disciplinary process, their noncompliance with the typical steps in the disciplinary process was not evidence of discriminatory intent. *Id*. at 353-354.

Plaintiff alleges that Defendant failed to follow its internal policies with respect to Plaintiff on four separate occasions: (i) Defendant placed Plaintiff on an Academic Improvement Plan ("AIP") (Doc. 160, p. 19); (ii) Defendant issued Plaintiff two red cards, with point deductions from her grade for each, *id*. at p. 19-20; (iii) Defendant failed to test Plaintiff for drugs immediately after clinical faculty at Belleville accused Plaintiff of drug possession/diversion, *id*. at p. 20; and (iv) Defendant placed Plaintiff in a second clinical placement after her second "red card," rather than immediately deciding whether to terminate her from the program. *Id*. at p. 20-21.

With respect to Plaintiff's first argument, Defendant's student handbook outlines different policies to be implemented in response to student difficulties in clinical placements. However, no policy specifically refers to an Academic Improvement Plan. If a clinical faculty member determines that a student "is not progressing satisfactorily or is demonstrating a pattern of suboptimal behavior [they] may recommend to the Assistant Dean for Graduate Programs and Graduate Student Affairs that the student be placed on clinical probationary status." (Doc. 160, Exh. 2, p. 107-108). However, the decision to place a student on clinical probation ultimately rests with the GSAC, "based on recommendations from the faculty member who evaluated the student's performance and the Assistant Dean for Graduate Programs and/or the Dean, School of Nursing." *Id*.

at p. 108. Thereafter, the faculty member and student "will develop a formal plan of remediation." *Id.*

Faculty members may also place students on an "Academic Intervention process" when that faculty member judges a student's clinical or academic performance to be a "C" grade level or lower. (Doc. 160, Exh. 2, p. 109). The student and faculty member must complete an Academic Intervention Form identifying areas of weakness and offering suggestions for remediation. *Id.* There is no "Academic Intervention Form" in the student handbook; however, the "Academic Improvement Plan" most closely tracks the goals outlined in the Academic Intervention policy. *See id.* at p. 190. The AIP states that the "process" includes the faculty and student meeting to discuss an identified problem area and to implement a remediation plan. *Id.* The plan includes space to describe the problem, the student's perception of the problem, the remediation plan, and the final goals and outcome to be achieved. *Id.* at p. 190-191.

On July 3, 2014, Mr. Hassler contacted Dr. Darr to inform him that Plaintiff's "critical thinking skills are deficient, there is a lack of progress and pharmacology knowledge and utilization continues to be deficient." (Doc. 160, Exh. 19, p. 14). Mr. Hassler's evaluation was predicated on an incident in which Plaintiff extubated a patient too early, though Mr. Hassler did not give Plaintiff a yellow or red card for the error. (Doc. 160, Exh. 1, 107:12-23; 108:16-19). Prior to this email, Plaintiff did not receive a single negative comment in her daily evaluations while placed at Mercy. (Doc. 160, p. 7). Dr. Darr appears to have initiated an Academic Intervention in response to Mr. Hassler's

email; he and Plaintiff completed an AIP which allowed her to continue in the class and clinical practicum while completing her remediation. (Doc. 160, Exh. 19, p. 16).

There appears to be no evidence indicating whether Dr. Darr believed Plaintiff had a "C" grade or below in the clinical practicum thus warranting an academic intervention. There is also no evidence indicating whether Dr. Darr believed Mr. Hassler's email indicated that his eventual evaluation would lower Plaintiff's grade to a "C" or below. That being said, Dr. Darr's decision to place Plaintiff on an AIP is not contrary to Defendant's internal policies. The student handbook provides clinical faculty significant discretion in determining whether to refer a student to the GSAC for clinical probation; the policy states that the faculty "may" refer the student, not that they must or shall refer them to the GSAC. *Cf. Murphy v. Smith*, 138 S.Ct. 784, 788 (2018) (internal citations omitted) (finding that the term "shall" establishes a mandatory obligation rather than a liberty). Although it did not appear that Plaintiff's grade was "C" or below thus justifying an academic intervention, the evidence appears to indicate that the afforded discretion was exercised appropriately in light of the aforementioned intubation incident.

Plaintiff's fourth argument that Defendant failed to follow its internal policies likewise fails to find evidentiary support. Defendant's student handbook states that clinical faculty members may recommend that a student be placed on probation from the clinic if the student is "not progressing satisfactorily or is demonstrating a pattern of suboptimal behavior[.]" (Doc. 160, Exh. 2, p. 107). A student may also be immediately removed from a clinical practicum if, "in the instructor's professional judgment, the

student is unable to provide safe patient care and/or if this deficit is so serious that it cannot be remedied in the given clinical time[.]" *Id.* at p. 108.

Mr. Pinto did not recommend Plaintiff for probation. When the Chief Anesthesiologist at Carbondale stated that he did not want Plaintiff to continue at the site, Mr. Pinto removed Plaintiff from the site. *See* (Doc. 178, Exh. 1, 95:7-15). Contrary to the Chief Anesthesiologist's opinion, Plaintiff's instructor did not believe she was unable to provide safe patient care or to remedy her deficit in the remainder of her clinical time. (Doc. 155, Exh. 6, p. 1). Like in *Long*, the policy outlined in Defendant's student handbook provides clinical faculty the discretion to refer a student to probation, or to pursue a more severe remedy. *Cf. Murphy*, 138 S.Ct. at 788. Equally, while the student handbook mandates that instructors shall remove a student if their skills fall below a standard of safety, it is silent as to the proper course of action when a clinical placement requests a student's removal. *See, e.g., Tank v. T-Mobile, USA, Inc.*, 758 F.3d 800, 806 (7th Cir. 2014) (finding that there was no circumstantial evidence of discriminatory intent when a defendant did not have a policy regulating employment actions). As there is no policy regulating Defendant's choices in this context, Defendant cannot have applied its policy disparately. Indeed, the chosen course of action inured to Plaintiff's benefit, as she was placed in another clinical setting, as opposed to being removed from the Program.

Plaintiff finds greater success with her second and third arguments that Defendant failed to follow its internal policies. First, with respect to the issuance of "red cards," Defendant's student handbook outlines how a student's "moment-to-moment" evaluations by clinical supervisors may be implemented into a student's grade for the

clinical practicum. (Doc. 160, Exh. 2, p. 12). Clinical coordinators and preceptors may issue students "Special Emphasis Cards," including "red cards," in order to denote particular commendations or concerns regarding a student's performance during a particular event. *Id*. at p. 13. When denoting a problem, coordinators may issue either a yellow or a red card. (Doc. 160, Exh. 2, p. 141). According to the student handbook:

> A **Yellow Card** represents a problem in student performance that needs to show significant improvement. A **Red Card** is issued when an incident with a student occurs that could or would have caused significant morbidity or mortality without intervention or if a student has created an unacceptable workplace environment.

*Id*. (emphasis in original). An incident which would have caused "significant morbidity" is one which caused "significant injury," though the definition of "significant injury" is dependent on the judgment of the clinic coordinator. (Doc. 160, Exh. 3, 97:8-22). Dr. Darr, who designed the policy, stated that the card system was intended to ensure that clinical coordinators evaluated the student at the scene of the event in question. (Doc. 160, Exh. 8, 69:5-9). Accordingly, clinical faculty issue the cards, and school faculty determine the appropriate point deductions for those cards. *Id*. at 65:9-15.

Plaintiff received both "red cards" while completing NURS 565b. According to the syllabus, Dr. Stein retained discretion to implement a deduction of up to eight percent from a final grade for the issuance of a "yellow card." (Doc. 160, Exh. 22, p. 11). Dr. Stein could also issue a deduction of up to sixteen percent from a final grade for the issuance of a "red card." *Id*.

Plaintiff was first issued a "red card" while at Carbondale, on June 18, 2015. (Doc. 160, p. 7). While assisting Mr. Wade with an extubation, Plaintiff handed Mr. Wade a

paralytic rather than the proper muscle relaxant. *Id.* at p. 8. As a result, the patient briefly stopped breathing; without intervention, the patient could have died. (Doc. 155, p. 4). However, Plaintiff contends that the responsibility for the patient's injury was with Mr. Wade. This is because Mr. Wade was responsible for administering the medication, and he should have checked that she handed him the correct drug before providing it to the patient. (Doc. 160, Exh. 1, 166:24-167:8). Plaintiff therefore argues that her error was more common, thus warranting a less severe "yellow card."

The testimony of Plaintiff's clinical coordinator, Mr. Pinto, leaves room for dispute as to whether he believed that Plaintiff's error was a "common" error justifying a "yellow card" or an "egregious error" justifying a "red card." (Doc. 178, Exh. 1, 73:10 – 76:6; 81:5-86:8). Mr. Pinto first explained that "lookalike vials" make mistakes similar to Plaintiff's error more likely "anywhere that you get drugs." *Id.* at 70:22-72:18. Moreover, if a student had "spiked something but didn't administer it," *i.e.*, if Mr. Wade had double-checked the vial himself before providing the patient the medicine, the error would be "[n]o harm, no foul." *Id.* at 82:18-21. However, he also noted that Plaintiff's mistake was "a significant event." *Id.* at 81:16-17. Not only could the patient have sued the hospital, but "she was [also] on a ventilator and didn't need to be." *Id.* at 81:17-19.

In determining whether to issue a "red card," Mr. Pinto first discussed the matter with either Dr. Stein or another member of the faculty. *Id.* at 73:19-74:1. The faculty member told Mr. Pinto that Plaintiff's error was "an issue and that's what [a 'red card'] is for." *Id.* at 74:12-13. Mr. Pinto's deposition statements indicate that this conversation persuaded him to give Plaintiff a "red card." Though he believed Plaintiff did not meet

the necessary standards, his conversation with faculty was "part of his education" in determining whether Plaintiff's error warranted a "red" or "yellow" card. *Id.* at 74:16-75:6. Ultimately, Mr. Pinto concluded that issuing a "red card" to Plaintiff was appropriate "in collaboration with Kevin Stein[.]" *Id.* at 78:9-11. Dr. Stein places his conversation with Mr. Pinto in context: faculty will issue a "red" or "yellow" card in instances where they feel that a card is warranted, but the clinical coordinator will not issue a card. (Doc. 160, Exh. 10, 131:7-10). However, faculty cannot remove or ignore a "red card" if the clinic coordinator chooses to give one. *Id.* at 133:19-22. This practice is not outlined in Defendant's student handbook.

Plaintiff received her second "red card" after an incident on July 24, 2015. (Doc. 155, p. 4). During a particularly difficult intubation, Plaintiff and her supervisors employed a "variety of methods." (Doc. 160, p. 9). While Plaintiff attempted the intubation, those present heard a "pop." *Id.* After intubation and inspection, Plaintiff's supervisors noted that the patient's veneer had popped off. *Id.* Mr. Pinto noted that there was no trauma to the patient, except for the lost veneer. (Doc. 178, Exh. 1, 94:17-19). However, after calling Dr. Stein and talking with other faculty members associated with Defendant, Mr. Pinto determined that giving Plaintiff a "red card" was appropriate. *Id.* at 102:4-11. Mr. Pinto would not have made this decision independently. *Id.* at 105:19-21.

Both Mr. Pinto and Dr. Stein retained a degree of discretion in assigning a "red card" and determining the point deductions for that "red card" pursuant to Defendant's internal policies. Much like the defendants in *Long*, who were empowered by the company's internal policies to skip steps in a progressive discipline routine, Mr. Pinto

was not limited by policy to choosing a "yellow" or "red" card for specific errors. He and other clinical faculty could determine whether a "yellow" or "red" card was appropriate based on the circumstances of each individual error. However, unlike in *Long*, Dr. Stein was not empowered by policy to influence that decision. Though Dr. Stein claims that school faculty determines whether a "red card" should be issued with clinical faculty, the student handbook stipulates that only clinical faculty are provided with special emphasis cards.

The justification for this policy further demonstrates that Dr. Stein did not have discretion to encourage Mr. Pinto to give Plaintiff a "red card." Dr. Darr noted that this policy is intended to reflect clinical coordinators' opinions of the error based on their perception of the incident in the context of the working environment. Dr. Stein did not have access to that information. The appropriate measure of his evaluation of Plaintiff's error was in the point deduction for the "red card," and not in issuing the "red card" itself. A reasonable jury could thus conclude that in counseling Mr. Pinto as to whether Plaintiff should be assigned a "red card," Dr. Stein failed to follow Defendant's internal policies.

Defendant also failed to follow its internal procedures for drug testing students accused of mishandling controlled substances. If "reasonable suspicion exists . . . that a student is using or under the influence of drugs or alcohol use, abuse or diversion, the student shall be subject to screening for drugs or alcohol." (Doc. 160, Exh. 2, p. 97). The student handbook further stipulates that reasonable suspicion:

> shall be based on student behaviors, observed or reported, of objective, quantifiable symptoms, included but not limited to alcohol on breath, slurred speech, flushed face, dilated pupils, mood swings, motor incapacities, deterioration of academic or work performance, and/or absenteeism, that suggest impairment of a student's ability to meet standards of performance, competency, and safety in the clinical setting, office, or classroom due to the influence of a drug.

*Id*.

On July 29, 2015, while Plaintiff was practicing at Belleville, Ms. Warner directed Plaintiff to draw two milligrams of Versed from a vial. (Doc. 160, p. 11). Plaintiff claims the vial only included one milligram. *Id*. Nevertheless, Plaintiff was required to attend a meeting with Dr. Griffin, Dr. Stein, and Dr. Comrie during which she was asked to account for the missing Versed. (Doc. 160, Exh. 1, 209:12-210:5). Plaintiff offered to take a drug test, but the site had already closed. *Id*. Plaintiff did not take a drug test. *Id*.

It is clear that clinical and school faculty had questions regarding whether Plaintiff misplaced, misused, or otherwise mishandled the alleged missing Versed. These questions could indicate an impairment of Plaintiff's ability to meet standards of performance, competency or safety in the clinical setting due to drug diversion. Thus, it appeared that clinical and school faculty had reasonable suspicion that Plaintiff abused and/or diverted the Versed. Despite this reasonable suspicion, however, Plaintiff was not screened for the influence of drugs. A reasonable jury could thus conclude that Defendant failed to follows its internal policies in this regard as well.

In light of this evidence, Plaintiff has sufficiently demonstrated that Defendant failed to follow its policies in its treatment of Plaintiff. As a result, the first and third prongs of Plaintiff's prima facie case under the modified *McDonnell-Douglas* test merge.

Thus, though Plaintiff cannot show that she met Defendant's legitimate expectations, she has the opportunity to demonstrate that those expectations were not applied consistently by pointing to similarly-situated younger students who Defendant treated more favorably than Plaintiff. The Court will now proceed to analyze the third prong of the modified *McDonnell-Douglas* test.

> ## 2. Whether Defendant Treated Similarly-Situated Younger Students More Favorably than Plaintiff

The third prong of the modified *McDonnell-Douglas* test concerns whether there are any similarly situated younger students that the Defendant treated more favorably than Plaintiff. This inquiry requires a "flexible, common sense" examination of all factors relevant to determining whether a compatriot is "similarly-situated" to the plaintiff. *See Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (internal citations omitted). The purpose of this prong is two-fold. First, the similarly-situated test eliminates "other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable – discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal citations omitted). Second, the prong provides the plaintiff the "boost" that the *McDonnell-Douglas* test was designed to provide to those demonstrating discriminatory intent through circumstantial evidence. *Id*. at 852.

Compatriots are "similarly-situated" to a plaintiff if they are directly comparable in all material respects. *See Reed v. Freedom Mortgage Corporation*, 869 F.3d 543, 549 (7th Cir. 2017). However, those compared need not be "identical in every conceivable way." *Coleman*, 667 F.3d at 846. This is a "flexible inquiry with no magic formula." *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018). This prong is also not intended to be an "insurmountable hurdle" for plaintiffs. *Coleman*, 667 F.3d at 852. Instead, the question of whether compatriots are similarly-situated with a plaintiff is typically one appropriately before a finder of fact. *Id* at 846-847. Summary judgment is only appropriate on this issue if no reasonable factfinder could find that the plaintiff has met her burden. *See Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 948-949 (7th Cir. 2009).

Plaintiff relies on a comparison to similarly-situated students to show both that Defendants carried discriminatory animus and that it applied its legitimate expectations in a disparate manner. Plaintiff's primary comparator is twenty-seven-year-old N.K. (Doc. 160, p. 23). Similar to Plaintiff, N.K. provided a patient with a paralytic instead of the proper muscle relaxant at the end of an anesthetic; the patient was transferred to another facility while on a ventilator. *Id*. N.K. then lied to his clinical supervisor about the incident and denied giving the paralytic to the patient. *Id*. at p. 24. The Chief Anesthesiologist for N.K.'s clinical placement requested he be removed. *Id*. Though N.K. received a "red card" for his violation, he only received a deduction of ten percent of his grade. *Id*. N.K. was then placed in another clinical facility approximately two months later. *Id*. However, multiple supervisors claimed that he had a cavalier attitude and lack of respect. *Id*. He was denied the opportunity to return to the clinical site. *Id*. Nevertheless,

he received only a "yellow card" and received a "B" grade for his time in the class. *Id*. He was not removed from the program. *Id*.  Plaintiff also points to A.Q., who caused a patient a soft palate injury requiring stitches. (Doc. 160, p. 25). A.Q received a "yellow card" for his clinical error. *Id*. That "yellow card" carried only a seven-point deduction. *Id*.[6]

In response, Defendant asserts that neither A.Q. nor N.K. are similarly-situated to Plaintiff because neither student was dismissed by the GSAC after refusing to discuss their performance with the Program Director (Doc. 161, p. 13). Further, neither A.Q. nor N.K. were removed from two clinical sites due to patient safety concerns. (Doc. 161, p. 12). Defendant, however, inappropriately narrows the scope of possible discrimination under the Act with this response. Because Plaintiff may uphold her prima facie burden by demonstrating that Defendant discriminated against her when assigning point deductions to her "red cards" or in otherwise encouraging clinical faculty to assign her a

---

[6]     Plaintiff also points to four other comparators who received "yellow cards" rather than "red cards" for medication errors or received lower point deductions for their "red cards" than Plaintiff received for her errors. (Doc. 161, p. 24-25). However, the first of these comparators did not receive a grade deduction because point deductions were not in Defendant's syllabi that semester. *Id*. at p. 24. The remaining two medication-error compatriots gave patients different medications than Plaintiff gave her patient. *Id*. at 24-25. The effect of a medication error on a patient plays a role in the point deduction assigned to a "red card;" if a mistaken medication has the same ultimate effect as the intended medication, the assigned deduction may be lower than a mistaken medication which harms the patient. (Doc. 160, Exh. 10, 137:25-138:11). Though these comparators engaged in similar behavior as Plaintiff, their circumstances differ so as to justify Defendant's differing treatment of the four students. Plaintiff also describes a student who did not take charge during an emergency situation; however, she does not explain how that student's behavior is similar to Plaintiff's behavior. (Doc. 160, p. 25). These comparators therefore do not support Plaintiff's conclusion that Defendant treated similarly-situated, younger students more favorably than her.

"red card," Plaintiff does not need to find students who were removed from their clinical sites or referred to the GSAC in order to point to similarly-situated compatriots.

Dr. Stein supervised both N.K. and Plaintiff. (Doc. 167, Exh. 19, p. 1). N.K. and Plaintiff both provided supervisors with a paralytic rather than a muscle relaxant to administer to patients. *Id*. Both N.K. and Plaintiff were accused of having an unprofessional attitude when confronted with their mistakes, and clinical faculty for both N.K. and Plaintiff emphasized that the students had otherwise performed well in their clinics. *Id*. at p. 6-7. There are no other circumstances justifying differing treatment of the two students, and Defendant offers none.[7] A reasonable jury could therefore find that N.K. and Plaintiff are "similarly-situated," and that Defendant treated N.K. more favorably than it treated Plaintiff when assigning only a ten-point deduction to N.K.'s grade, in comparison to the twelve to sixteen-point deduction to Plaintiff's grade.

Dr. Stein also evaluated both Plaintiff and A.Q. (Doc. 167, Exh. 23, p. 10). Like Plaintiff, A.Q. injured a patient during a glide scope intubation by lacerating the patient's pharynx. *Id*. at p. 1. However, unlike Plaintiff, A.Q. received only a "yellow card," rather than a "red card" for his error. (Doc. 160, p. 25). His final point-deduction for the "yellow card" was seven points. *Id*. Neither A.Q. nor N.K. were sent to the GSAC.

It is unclear how many points Plaintiff had deducted from her grade for her second "red card." However, as Defendant does not rebut that A.Q. and Plaintiff caused similar

---

[7]     Plaintiff does not provide the syllabus for the clinical practicum in the Fall 2016 semester, when Mr. Kozol completed his clinic. (Doc. 167, Exh. 19). However, at the summary judgment stage, Defendant bears the burden of showing that the two syllabi are sufficiently different to justify the differing treatment of the two students. Defendant does not do so.

injuries and does not provide evidence indicating whether Plaintiff's point deduction was eight points, zero points or somewhere in between for her second "red card," it remains a genuine issue of material fact whether the two similarly-situated comparators were treated disparately. By pointing to both N.K. and A.Q., Plaintiff has pointed to evidence that Defendant did indeed treat younger, similarly-situated students more favorably than Plaintiff.

### 3. Whether Defendant Subjected Plaintiff to an Adverse Action under the Modified *McDonnell-Douglas* Test

Plaintiff's claim ultimately fails with respect to the second prong of the modified *McDonnell-Douglas* test. Defendant claims that the "ultimate issue" in this case is whether it discriminated against Plaintiff on the basis of her age "when it terminated her from the [p]rogram." (Doc. 155, p. 9). Because the GSAC dismissed Plaintiff from the program, Defendant contends that Plaintiff must show that her age had a "determinative influence" on the panel's decision to dismiss her. *Id*. at p. 10. As each member of the GSAC provides affidavits explaining they did not consider age in the decision to terminate Plaintiff, Defendant contends that Plaintiff cannot meet this showing. *Id*. at p. 11.

Plaintiff responds that the "intent to discriminate against Plaintiff extends beyond Plaintiff's termination from the [p]rogram to other actions taken by Stein, Griffin and Darr that placed Plaintiff at a disadvantage and ultimately resulted in her dismissal." (Doc. 160, p. 19). Instead, Plaintiff argues that the GSAC were no more than pawns of Stein, Griffin, and Darr, who severed as the "cat's paw" in ensuring Defendant, through the GSAC, acted out their discriminatory intent. *Id*.

The Court disagrees. A plaintiff invokes the cat's paw theory of liability when a biased actor who lacks decision-making power "uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory" action. *Sinha v. Bradley University*, 995 F.3d 568, 574 (7th Cir. 2021). To show age-based discrimination under a cat's paw theory, the plaintiff must present evidence that the biased actor "actually harbored discriminatory animus against" them, and that the actor's scheme "proximately caused the adverse [] action." *Id.* (considering the cat's paw theory under the ADEA). Because the cat's paw theory requires a showing of both discriminatory animus and proximate causation, the court need not address both prongs if the employee makes an insufficient showing on one. *Id.*

While the proximate cause analysis requires only "some direct relation," the Court finds that Plaintiff is unable to prove that the scheme proximately caused her termination. Dr. Griffin submitted to the GSAC a letter, outlining the legitimate expectations Plaintiff failed to meet: (i) her medication errors, (ii) Plaintiff's poor technical airway skills, and (iii) Plaintiff's inability to take responsibility, accept criticism, and honestly and openly discuss issues with clinic preceptors and Program faculty. (Doc. 155, Exh. 6, p. 2). Each member of the GSAC submitted an affidavit stating that they did not consider age when considering Plaintiff's possible termination. *See* (Doc. 155, Exh. 9-19). Even assuming *arguendo* that Stein, Griffin and Darr schemed to terminate Plaintiff on the basis of her age, there is no evidence that this scheme proximately caused the GSAC's decision to terminate Plaintiff.

Actors may "avoid cat's paw liability on a claim" for age discrimination "if the decision maker is not wholly dependent on a single source of information and conducts [their] own investigation into the facts relevant to the decision." *Sinha*, 995 F.3d at 574. So long as the investigation results in an adverse action for reasons unrelated to the original biased action, the actor will not be liable for discrimination under the cat's paw theory. *Id.* Here, the GSAC terminated Plaintiff for "basic nursing errors," rather than her age. *See, e.g.*, (Doc. 155, Exh. 10, p. 2). The GSAC made this decision even though Dr. Griffin, in his referral to the GSAC, noted that the school faculty believed that Plaintiff had the "potential of safely being reintroduced into the clinical area." (Doc. 155, Exh. 6, p. 2). This indicates that the GSAC made its own independent judgment in adjudicating Plaintiff's situation. Furthermore, the GSAC Appeal Panel that convened on August 28, 2015, not only considered recommendations from Griffin and Darr, but allowed Plaintiff to "provide her own written statements and evidence, respond to numerous questions from the panel, and [make her own] opening and closing statements." (Doc. 155, Exh. 17, p. 2). Thus, the GSAC Appeal Panel did not make its decision based on a single source of evidence. *See, e.g.*, *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (noting that although the decision-making committee relied on materials that were compiled and submitted by defendant that when the committee also relies on plaintiff's own materials and statements there is "simply no evidence of bias . . . that proximately caused" the suspension or termination). Rather, the Committee considered evidence supplied by representatives from the CRNA Program as well as Plaintiff herself. Thus, Defendant is shielded from liability under the cat's-paw theory.

Even though certain actors in the Program arguably acted with discriminatory intent, the ultimate decision to terminate Plaintiff from the program was the GSAC. Each member of the GSAC explained that they did not consider Plaintiff's age when terminating her. *See* (Doc. 155, Exh. 9-19). Equally, members of the GSAC confirmed that they terminated Plaintiff because her mistakes were "basic nursing" mistakes, indicating that she was not able to complete the Program. *See id.* at Exh. 10. There is simply no evidence in the record that the GSAC acted with any discriminatory intent. Given the but-for causation standard required under the Act, Defendant cannot satisfy the second prong of the modified *McDonnell-Douglas* test. This is fatal to Plaintiff's claim and requires the granting of summary judgment in favor of Defendant. Because the aforementioned inquiry is dispositive, the Court declines to address the other arguments raised by the parties in the briefing of this matter.

## IV.   CONCLUSION

For the above-stated reasons, Defendant's motion for summary judgment (Doc. 154) is **GRANTED**. The Court **DIRECTS** the Clerk of the Court to close this case and enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED:  September 30, 2023.**

Digitally signed by Judge Sison 2
Date: 2023.09.30 17:26:55 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**